370 SUPREME COURT [*Philadelphia*

## Watts's Appeal.

1. If technical exceptions be not brought to the notice of the court in a formal manner and at a proper time, it will be presumed that the party elects to proceed on the merits.

2. Where directors of a corporation have so mismanaged its affairs as to be fraudulent, a bill may be maintained against them personally by a shareholder.

3. A shareholder, in such case, may, under proper circumstances, interpose for the protection of the corporation.

4. The directors of a corporation for the sale of land rejected offers for the purchase of its land; although this was imprudently done, yet being a matter resting in their discretion, if without fraud, they were not responsible.

5. The power to execute and issue bonds, contracts and other certificates of indebtedness belongs to all corporations, public and private, and is inseparable from their existence.

6. The power to contract necessarily involves the power to create a debt.

7. The charter of a land company gave the directors power to dispose of its land by deed or lease ; the power to mortgage land on a proper occasion and for a proper debt is implied.

8. The corporation owning a very large body of lands, had power by their charter " to aid in the development of minerals and other materials, and to promote the clearing and settlement of the country :" *Held*, that the building of saw-mills and an hotel for the accommodation of those having business in connection with carrying out the prime object of the corporation, was within its powers.

9. Even if such expenditures were *ultra vires*, stockholders knowing of them and not objecting until long after their completion could not compel the directors to account for the moneys expended.

10. When directors act honestly for what they esteem the best interests of the corporation, and do not wilfully pervert their powers, but only misjudge them, they will not be held to account for money expended in such case.

11. When an act of directors is in excess of their authority, but done with a bonâ fide intent of benefiting the corporation, and a shareholder, knowing of it, does not dissent within a reasonable time, his assent will be presumed, and he cannot gainsay it.

12. When the act of the directors complained of is to be followed by a large expenditure, the shareholder should not only make his protest within a reasonable time, but should follow it up by active preventive measures.

13. It is against good conscience that one having power to prevent should stand by and see his associates spend money which may result to his benefit, and afterwards charge them with it. His neglect to act at the proper time effectually bars his right.

14. Six years' omission to proceed would be a bar to an action against directors for the misuse of the corporate property.

15. The stockholders directed public sales of their lands, and that payment might be made in cash and in their bonds : *Held*, the payment in bonds was equivalent to cash.

16. Directors bought at the sales at fair prices, and the sales were conducted openly and fairly : *Held*, the sales to them were valid.

June 2d 1875. At Harrisburg. Before Agnew, C. J., Sharswood, Mercur, Gordon, Paxson and Woodward, JJ.

Appeal from Nisi Prius. In Equity. No. 2, to July Term 1870.

The bill in this case was filed by Henry M. Watts, John M.

[Watts's Appeal.]

Bickel, Lewis Seal, Charles E. Anspach and James Anspach, plaintiffs, against The McKean and Elk Land and Improvement Company, John C. Cresson, William Biddle, Frederick Fraley, Samuel Mason, Mordecai L. Dawson, John Livezey, Samuel Welsh, James R. Greeves, Frederick Collins, William Hacker, Charles H. Hutchinson, Harry G. Clay, William Welsh, Robert P. Kane, The Pennsylvania Company for Insurance on Lives, &c., the executor, &c., of I. P. Hutchinson, deceased, the executrix, &c., of S. M. Leiper, deceased, the executors, &c., of Jeremiah Hacker, deceased, S. Mason and E. F. Gay, trustees of McKean and Elk Land and Improvement Company under a first mortgage, C. H. Hutchinson and H. G. Clay, trustees of same company under a second mortgage, The New York and Erie Mining Company and The Erie Mining Company.

On the 6th of February 1856, an act was passed to incorporate The McKean and Elk Land and Improvement Company. It recited that Samuel M. Leiper died seised of an undivided fourth of land in the counties of Elk and McKean, &c.; that the other owners were desirous of converting their interests into the stock of a corporation, established by the act; that the interests of the widow and children would be injured by a sale of the lands by proceedings in partition which were threatened by the other owners, and that the executors of Leiper had no authority to convey the land to such corporation and receive as the other owners were about to do payment in the stock of the corporation; it was enacted :—

Sect. 1. That the executors, &c., of Leiper might sell and convey to the corporation the interest of Leiper in the lands, and receive its stock in payment.

Sect. 2. That Henry M. Watts, John K. Kane, Frederick Fraley, John C. Cresson, Samuel Mason, John Livezey, Joseph Cresson, Jeremiah Hacker, Mordecai L. Dawson, Samuel Welsh, James R. Greeves, I. P. Hutchinson, William Biddle, Thomas Struthers, and the executors of Leiper, their associates, successors and assigns, should be a corporation under the name of The McKean and Elk Land and Improvement Company, with all the privileges, &c., of a corporation.

Sect. 3. The corporators above named should, as soon as convenient, elect seven directors, to serve for one year; each share of stock to entitle the holder to a vote; the directors to choose one of their number for president, and other officers might be elected and appointed; the governor to issue letters patent on notice of the organization of the corporation.

Sect. 4. The corporation to value their lands and convert them into a common stock, to be divided into a convenient number of shares, which were to be apportioned amongst the owners of the

lands according to their interests respectively, for which shares certificates should be issued.

Sect. 5. The directors to sell the land and receive "any moneys, mortgages or other securities, including the certificates of stock of this corporation, in payment, * * * provided, that the said corporation shall sell and dispose of at least one-half of all their land within ten years, and the remainder, except 2000 acres, within twenty years from the date hereof.

Sect. 6. The corporation to have power to lease for a period not exceeding twenty years, any of the lands and the right, &c., of mining and carrying away iron ore, coal and other minerals and materials from the land, and "to aid in the development of the minerals and other materials, the use and transportation of them to market, and promote the clearing and settlement of the country ; * * * to employ their capital in the construction of such railways, not exceeding twenty miles in length, as may be necessary from such mines, to intersect the Sunbury and Erie or the Allegheny Valley Railroad; * * * to create a capital stock of $100,000, for the purposes specified in this section."

Sect. 7. Dividends from the sales of lands, &c., to be made amongst the shareholders at least once a year, " and when the proceeds of the sale of lands are paid to the holders of certificates of stock, such certificates shall be surrendered to the corporation and cancelled, and new certificates issued according to a uniform rule of equitable adjustment of the rights of shareholders, * * * so that whenever the whole of the lands shall have been sold the certificates representing the same shall have been entirely exhausted and cancelled."

On the 14th of April 1864 a supplement to the foregoing act extended the time for selling the lands of the company five years.

Another supplement, passed March 16th 1867, authorized the company to borrow money for purposes of improving and developing their lands, and for all other purposes of the corporation, at such rate of interest as they might deem advisable, or by sale of the bonds at a discount and secure the payment of the money borrowed by mortgage or mortgages on their estate.

A supplement was passed February 10th 1852, to the Act to incorporate the Sunbury and Erie Railroad Company (passed April 3d 1837). It authorized municipal or other corporations to subscribe for the stock of the Sunbury and Erie Railroad Company, and to borrow money to pay therefor ; the bonds that might be issued by such corporations bearing interest at six per cent. per annum might be received by the railroad company as cash in payment of the subscriptions for stock, &c.

The bill set out :—

1. That H. M. Watts, July 1st 1855, was owner of one-fourth, Leiper's representatives one-fourth, Fraley, Cresson, Hacker,

Greeves, Biddle and Hutchinson's estate were owners of the other half of land in McKean and Elk counties, comprising between 120,000 and 150,000 acres; and the act (above stated) to incorporate the McKean and Elk Land and Improvement Company.

2–9. Set out the provisions of the act, its acceptance, issue of letters patent, &c.

10, 11. Conveyance of the land to the corporation, and its conversion into stock; 108,000 shares issued to the owners of the land, and 12,000 shares reserved for incidental expenses.

12. That plaintiffs held more than 30,000 shares of the stock; and charging the directors with neglect of duty, malfeasance in office and perverting the purposes of the corporation.

13. That the directors neglected to sell the land as required by the act of incorporation, viz., one-half in ten years, and the remainder in twenty years, and make dividends of the proceeds at least once a year.

14. Subscribing without authority of law for 1625 shares of the stock of the Sunbury and Erie Railroad Company; to be paid for $100,000 in cash and 5000 acres of land, Watts, who was president, voting against the subscription and resigning.

15, 16. Watts's various protests and efforts to withdraw his land.

17. Assessment of 60 cents per share on the stock.

18. The unlawful execution of a mortgage, February 1st 1863, for $200,000 to Mason and Gay, trustees.

19, 34. Selling and conveying land to the Erie Mining Company, and the New York and Erie Mining Company in 1865, and accepting 11,750 shares of the stock of those companies in payment.

20, 21. Unlawfully executing a mortgage, June 22d 1867, for $267,000, to C. H. Hutchinson and Harry C. Clay, as trustees; the bonds secured by both mortgages taken by the directors, who were makers, sellers and purchasers.

22. Sale in 1857 of 9000 acres of land for $51,654.

23–25, 32. In 1868 the directors proposed to sell 98,795 acres and sold 35,600 acres at various prices, 62 per cent. payable in stock, 36 per cent. in mortgage bonds, and 2 per cent. in cash; the 35,600 acres were part of 98,600 acres estimated by a committee of the directors at $2,254,788; the sales were to shareholders, creditors and directors, on terms prescribed by themselves, and would exceed $400,000.

26, 27. Since November 1859, Watts had been persistent in his efforts, by written and verbal communication, to withdraw his land or purchase it; and the refusal of the directors to sell to one Putnam, who proposed to purchase 15,000 acres at $25 per acre.

28. The directors, by accepting conveyances of the land from the owners, assumed all the duties imposed by the charter, which they have neglected and refused to perform, &c.

30, 33. The directors, without authority of law, had contracted

debts, and engaged in the erection of saw-mills, hotels and other buildings, and had misappropriated the funds instead of dividing them amongst the shareholders.

31. The directors mortgaged the lands so that they necessarily became purchasers of the bonds secured by the mortgages; on the 20th of February 1870 they threatened to foreclose the mortgages if the stockholders did not raise money to pay taxes.

The relief prayed for was for a decree:—

That the two mortgages were void, and not a lien; that the sales to the two mining companies be set aside, or if valid that the directors individually pay the plaintiffs their proportion of $117,500, the value at which they estimated the shares of these companies' stock; that the subscription to the Sunbury and Erie Railroad stock was without authority of law, and the directors pay the plaintiffs the damages they may have suffered by it; that an account be taken, and defendants pay, &c.; that the land to which plaintiffs may be entitled be conveyed to them clear of encumbrance; or, if that cannot be done, that the directors individually pay the plaintiffs the value for each acre they should not be able to convey; that the sale of the 35,600 acres was without authority and void, or that the directors pay plaintiffs their proportion of their value; that they pay the taxes; and an injunction restraining a sale by the trustees under the mortgages; there was also a prayer for general relief.

The answer of the McKean and Elk Land and Improvement Company denied the allegations of the 12th paragraph of the bill; denied the charges in the 13th paragraph, and averred that they had done all in their power to effect a sale of the land; the land was inaccessible, except in the neighborhood of the Sunbury and Erie Railroad; the completion of this road had been delayed for nearly nine years; outlays were required for roads, &c., without funds to make them; all the large shareholders, except Mr. Watts, were willing to contribute; there was always an agent residing in the neighborhood to make sales; whilst Mr. Watts was president, the price of farm land had been fixed at $5 per acre, but under the direction of the defendants, in January 1861, the price was fixed at $2 per acre without obtaining purchasers; no sales of any magnitude had been made during Mr. Watts's presidency, nor had he, although often requested, suggested any plan for effecting sales. Denied recollection of allegation in 27th paragraph, that Putnam offered to purchase land at $25 per acre; demanded proof of it and of his ability to pay. Admitted the subscription to the Sunbury and Erie Railroad stock. They averred that the importance of the railroad as an outlet to the lands, even at a large outlay, was appreciated from the beginning and recognised by Mr. Watts in drafting the charter. In 1858 a com-

mittee, of which he was one, reported that a fair price could not be obtained without such outlet.   The Act of February 10th 1852 conferred authority to make the subscription ; a committee was appointed to negotiate with the railroad company, the effort being to save the construction of a connecting road by securing a change of route, and obtaining a route which was contiguous to and traversed the lands for many miles ; authority from the stockholders to make subscription, of which $91,000 of first mortgage bonds were agreed to be taken.   There was a failure to make any arrangement with Mr. Watts because of his unreasonable demands, and because he claimed an allowance for the charter and to be free from any responsibility to the Sunbury and Erie Company, and that he asked warrants along the line of the railroad.

There was a large indebtedness for taxes, surveys, &c. ; the shareholders, who had previously assisted, declined to contribute further on account of Mr. Watts's persistent refusal to aid or to permit the lands to be sold at public sale, or to raise funds ; and his dissent from any assessment on the shareholders to pay the liabilities ; and interposing difficulties to raising money from sale of lands, and warning the company not to permit them to be sold for taxes.   The stockholders, on the 16th of May 1862, authorized the first mortgage to pay the then present indebtedness and the subscription to the railroad ; $91,000 of the mortgage bonds were appropriated to pay the subscription and remainder to legitimate indebtedness ; none of the proceeds of the mortgage were converted to the private use of the directors or misapplied.   The second mortgage was made with the approval of the stockholders, under the Act of March 16th 1867.   Watts admitted the propriety of investing funds for improvements, and that the Act of 1867 removed most of his objections to the carrying on of improvements, &c., by the corporation.   The bonds were not chiefly taken by the directors ; opportunity was offered to Watts to subscribe ; he agreed to subscribe to a working capital, and withdrew his subscription because, as he alleged, it had been made with the understanding that he was to be president.

At a stockholders' meeting in February 1868, a plan for the division of the land amongst them was recommended, which was referred to a committee for conference with the directors ; there were other meetings for the same purpose, and on May 29th 1868 a public sale was authorized, should the plan of division fail ; it did fail, and there was a public sale October 20th 1868.

There were throughout the answer denials of neglect of duty and of misapplication or misappropriation of the funds.

Separate answers of the other defendants were filed, denying, amongst other things, misappropriation of the funds and neglect of duty.   Some of these denied any connection with any of the matters charged.

Replications were filed and an examiner appointed, who took and reported a great mass of testimony. William J. Price, Esq., was appointed master. He reported elaborately and at great length. He found the following facts :—

At a meeting of the directors they resolved that the shares of stock to be issued should be equal to the number of acres, and then should not exceed 108,000 shares, each share to represent one acre, and to be estimated at $50 till otherwise ordered; the shares reserved were 12,000, and were to abide the future action of the company. The directors acted with great promptitude to carry on the primary objects of the corporation. The lands were of great value for timber, coal and iron, and also for agricultural purposes, but it was an almost unbroken wilderness, and away from public highways, so that their resources could not be made available. The Sunbury and Erie Railroad and the Allegheny Valley Railroad were looked to as soon to furnish outlets to market. The leading object of the company was to sell the lands and divide the proceeds amongst the stockholders. All the directors labored earnestly to interest capitalists and make sales of the lands. In May 1858 a committee of the directors was appointed to endeavor to effect sales of the lands and stock, and ascertain if anything could be done to aid in procuring an outlet to market. In September the committee reported, that obtaining a fair price for their lands could not be accomplished until there was an outlet for their mineral product, and that which seemed likely to benefit them first was the western portion of the Sunbury and Erie Railroad ; this railroad (afterwards the Philadelphia and Erie Railroad) was not opened till seven years after the report ; its first train went through in October 1865. This delay prevented sales of lands and there were no dividends; but the accumulation of taxes and the necessary expenses were large and to be provided for. In 1859 the company subscribed for $162,500 of the stock of the railroad company, in order to secure a railroad through their lands; the subscription was paid in 1863, by $91,000 of the mortgage bonds mentioned in the bill, 4800 of the reserved 12,000 shares of stock, and 200 acres of land. The first mortgage was issued February 1st 1863, to Samuel Mason and Edward F. Gay, as trustees ; the bonds secured by it amounted to $200,000, and were to meet the subscription to the railroad stock and other liabilities. During the oil excitement in 1864, 1865, a lease was made to an oil company of some of the company's lands supposed to contain oil. This enterprise failed ; while the excitement continued, the stock of the Land and Improvement Company was sought after and sold at increased prices ; some was sold at $20 per share, but upon the failure of the efforts for oil its value decreased ; Lewis Seal, one of the plaintiffs, bought 800 shares for $1 per share.

In September 1866, the stockholders authorized the directors

to raise by loan $200,000 to meet liabilities accrued, and provide means to meet future liabilities; and to issue bonds to be secured by a second mortgage. Mr. Watts denied the power of the company to raise funds in that way; the Act of March 16th 1867, *supra*, was passed to confer the power. A second mortgage and bonds were executed June 22d 1867, Charles H. Hutchinson and Harry C. Clay being the trustees.

The master found that the failure to sell more land within the time limited by the charter could not be attributed to the neglect of the directors or to a disregard of the provisions of the charter. The long delay in the opening of the Philadelphia and Erie Railroad contributed in a large measure to the disappointment of the objects and calculations of the original owners of the land.

" In this condition of things, the successive boards of directors were obliged to assume a difficult and at times a delicate management; but they appear to have communicated frequently with the other stockholders, and to have conducted their management under the counsel and with the approval of a large majority of them. In the opinion of the master, the evidence fully justifies the conclusion that the successive boards of directors proceeded from time to time in such manner as they honestly believed to be for the best interests of all the stockholders."

As to the subscription to the Sunbury and Erie Railroad, * * * " The railroad company being without means to complete the undertaking, those who were supposed to be benefited by the road were called upon to contribute to its construction. The location of the road at some points was made dependent upon the manner in which such calls were responded to. * * * The railroad would not have touched the land of the McKean and Elk Company at all, if the subscription had not been made; but that it would have been laid at least ten miles away. With the subscription, however, the road was laid about fourteen miles through the company's land, and added considerably to its value.

" The following facts show what action was had in the McKean and Elk Company, in relation to the subscription complained of, so far as it appears in the evidence. The attention of the board of directors was called to the subject by Mr. Fraley, in August 1857. The directors' minutes, under date of December 14th 1857, show that the president laid before the board a programme for a basis of land operations between the McKean and Elk Company and the Sunbury and Erie Railroad Company, which was referred to a committee of three stockholders—John C. Cresson, John K. Kane and Henry M. Watts—to report at a future meeting. On December 26th 1857, that committee presented a communication to the board, which was considered; and it was agreed that the company would negotiate with the Sunbury and Erie Railroad Company for 15,000 acres of land, at six dollars per acre, to be paid for in the

stock of the railroad company at par. That transaction does not appear to have been consummated as proposed. But at a meeting of directors, held on the 5th day of May 1859, called for the purpose of considering the subject of subscribing to the stock of the Sunbury and Erie Railroad Company, a committee of three— Henry M. Watts, Frederick Fraley and James R. Greeves—was appointed, with authority to make a subscription of $100,000, conditioned on the adoption of the route by the West Clarion and Two-mile run, the subscription not to be payable until the road was completed. The subscription appears to have been made on the 14th day of June 1859, payable in 5000 acres of land at $12.50 per acre, and $100,000 in cash, upon completion of the road. It appears also to have been made by the directors for and in the name of the McKean and Elk Company. The directors at that time were Henry M. Watts—who was also president of the company—John C. Cresson, Samuel Mason, Mordecai L. Dawson, Frederick Fraley, James R. Greeves and Robert P. Kane. Mr. Watts resigned as president and director on the 12th day of November 1859. The subscription thus made by the directors for the company was ratified by the stockholders. The answer of the McKean and Elk Company in this case, supported by the minutes of a stockholders' meeting held May 16th 1862, shows that the act of the directors was adopted, and that they were authorized by the stockholders to borrow $200,000, to pay, among other things, the subscription to the Sunbury and Erie Railroad Company, and to issue bonds of the McKean and Elk Company, secured by a mortgage of its lands, for repayment of the money so borrowed.

" At a meeting of the directors of the McKean and Elk Company, held March 13th 1863, Mr. Fraley, of the committee to subscribe, reported that the Philadelphia and Erie Railroad Company had agreed to settle the McKean and Elk Company's subscription by receiving $91,000 of six per cent. bonds of said company, 200 acres of land at or near the summit—to be selected by mutual agreement—and 4800 shares of the reserved stock of the company, for which the McKean and Elk Company was to receive $162,500 of the stock of said railroad company at par. This proposition was accepted by the board of directors."

The master was of opinion that the company had power to make the subscription.

As to the first mortgage :—

* * * " At the time of the creation of this mortgage, the taxes upon the lands of the company for the years 1860–'61, amounting to $11,600, were due and payable, and the lands were liable to be sold for the taxes. The company was without money, and stood indebted to stockholders for advancements to a considerable amount, to pay current expenses. It was indebted also for surveys and explorations of the lands, necessarily incurred in prepar-

[Watts's Appeal.]

ing them for sale, and as part of the efforts of the directors to induce purchases. The company was also under obligation to meet the subscription to the stock of the Sunbury and Erie Railroad Company. The efforts to raise money by sales of lands had proved abortive, as had also an attempt to obtain a loan by assessing the sum rateably upon the stockholders. In this condition of affairs, a stockholders' meeting was held on the 16th of May 1862, to consider and take action upon the financial condition of the company, at which meeting it was unanimously 'resolved that the directors be and they are hereby authorized to borrow the sum of $200,000 for the purpose of paying off the present indebtedness of the company; for the payment of the subscription to the stock of the Philadelphia and Erie Railroad Company, and for such other purposes as the interests of the company may, in their judgment, require, * * * and the repayment of the money so borrowed shall be secured by mortgage of the real estate of the company.'

"Thereupon the board of directors resolved to borrow the sum of $200,000 in the name of the company, and to execute and issue bonds for the same, * * * and a mortgage of all the lands of the company to Samuel Mason and Edward F. Gay, in trust, to secure the payment of the principal and interest of the said bonds. * * * The bonds and mortgage were thus created by the company, and the proceedings of the directors therein were grounded upon the action of the stockholders as the source of authority for what they did. It is true, that the charter of the company is silent upon the subject of borrowing money. It neither expressly authorizes nor forbids it; and it may be assumed that such a transaction was not contemplated when the charter was obtained. * * * A corporation has incidental authority, when not specially restricted, to borrow money for any of its lawful purposes, and when by its charter it is authorized to purchase in fee or for any less estate all such lands, tenements and hereditaments as shall be necessary and convenient in the prosecution of its works, and the same to sell and dispose of at their pleasure, it has power to mortgage its real estate to secure the payment of a debt. The master is of the opinion, therefore, that the said first mortgage, dated the 1st day of February 1863, was not *ultra vires* and void, as charged in the bill.

" The second mortgage stands upon a footing different from the first one, under the Act of March 16th 1867, *supra*. * * *

" At a meeting of the stockholders, held the 18th day of September 1866, the directors were authorized by resolution to raise by loan the sum of $200,000, 'for the purpose of discharging the present and providing funds to meet future obligations of the company.' * * * The bonds with 6 per cent. interest * * * to be secured by mortgage of the estate of the company. And the

directors were authorized to sell the bonds at such time, at such rates and on such terms as they should deem best for the interests of the company. At a meeting of the directors, on the 24th of September, it was resolved that, agreeably to the said authority given by the stockholders, the sum of $200,000 should be raised by a sale of 6 per cent. bonds of the company; * * * that the payment of the said bonds should be secured by a first mortgage on the lot of ground and buildings now erecting thereon for a hotel, and the lots of ground and buildings to be erected thereon by the company for dwelling and boarding-houses, situate in the town of Kane; and also by a second mortgage on the other estate of the company, said mortgage to be made to trustees, and to contain provisions for the release of the mortgaged premises, in the case of sale, on the payment to the trustees of the proceeds, of not less than one-fourth of the purchase-money, or of the securities received therefor. It was also resolved to offer the bonds to the stockholders at the rate of seventy-five cents on the dollar. The foregoing authorizations are recited in the mortgage. * * * The master is of the opinion that the mortgage is within the terms of the supplement to the charter of the company, already referred to at large, and therefore valid."

As to the sale of land to the mining companies, " There were certain portions of the lands of the McKean and Elk Company interlaced with lands belonging to other parties, some of which latter Gen. Thomas L. Kane had purchased and obtained rights to purchase, and which were known to contain limestone and outcroppings of coal. On the 11th day of May 1865, at a meeting of the directors of the McKean and Elk Company—called to consider the propriety of placing a portion of the lands of the company lying in Johnson's Run Coal Basin in two coal companies about being formed, one to be called the Erie Mining Company, the other the New York and Erie Mining Company—Gen. Kane attended, and it was proposed to start these organizations with each about 300,000 acres of land, of which it was thought the McKean and Elk Company could furnish nearly one-half, the remainder to be furnished by the parties owning very valuable coal lands, adjoining lands of the McKean and Elk company. ' The board believing the interests of our stockholders would be promoted by these companies being organized, it was, on motion, resolved that the proposition be accepted on the terms to be agreed upon by the Committee on Real Estate.'"

" On the 7th of November 1865, it was resolved by the directors to make those sales to the two mining companies, and to receive in payment therefor, shares of the capital stock of those companies, and that one-half the stock thus received in payment should be transferred and paid over to Samuel Mason and Edward F. Gay, trustees of the first mortgage, upon their executing proper

releases of the land sold. The conveyances were subsequently made and the stock received. The entire stock of the mining companies was distributed to the McKean and Elk Company, and to the private owners, in proportions corresponding with the lands contributed by them, respectively, to the companies. The lands conveyed to said mining companies were so interlaced with others, not belonging to the McKean and Elk Company, as to be incapable of being worked to advantage, and were without outlet—isolated and practically valueless, unless incorporated with the other adjoining lands. This transaction is not charged in the bill to have been fraudulent or intentionally wrong; and the defendants claim, through the answer of the McKean and Elk Company, that the transaction was a fair one, advantageous to that company, and that it was approved by the body of the stockholders. * * * The mining companies appear to have been formed at about the time the Philadelphia and Erie Railroad was opened for business, and were no doubt looked to as a means of developing the mineral lands which were conveyed to them, and of yielding to the McKean and Elk Company a full share of the wealth which the lands were supposed to contain.

"It is apparent from the evidence that the transaction in question was explained to and approved by most of the stockholders of the McKean and Elk Company, though the master does not find any evidence that Mr. Watts was present, or that he gave in his assent. Whether Charles E. Anspach was then a stockholder, does not clearly appear, though he became one some time in the month of November 1865. Neither of the other plaintiffs became stockholders until some time afterwards. The plaintiffs have not proved a want of good faith on the part of the directors of the McKean and Elk Company in the transaction, nor that the directors were, in any event, to acquire personal gain beyond that which might come to them as stockholders, and in common with all the others. It is quite possible, however, that there may have been an error of judgment about it, which has been rendered most apparent by subsequent experience; but if that be so, it was an error in which the body of the stockholders participated. * * * The stock of the mining companies was believed to be valuable when received in payment for the lands sold to those companies, with prospects of considerable increase in value at no distant day. The plaintiffs substantially affirm thus much in their bill, when they give the directors' estimate as to the stock. It was at that time certainly equivalent in value to the land conveyed by the company, or thereabouts, for the shares of stock had been apportioned according to the values of the lands which constituted the capital of the mining companies, and were issued to the respective vendors of the lands accordingly. If the stock thus taken has since depreciated in value, or even become worthless, without wilful neglect

or wrongful misconduct of the directors of the McKean and Elk Company, yet those directors are not required by the charter of the company to become guarantors of the ultimate value of the securities which they are authorized to receive in payment for lands sold; nor are they individually liable for honest mistakes of judgment in relation to present or future value of the securities taken in payment.

" The master is not aware of any ground on which he would be justified in reporting either that the sale was made without authority of law, or that the directors, individually, should account and pay to the plaintiffs in respect of it.

" The lands of the mining companies were sold for taxes in June 1870, and bought in at the treasurer's sale, by Gen. Kane, under previous arrangement, which has since been put into the form of an agreement. By the terms of that agreement, Gen. Kane holds the lands which belonged to those companies before the treasurer's sale, in trust for and to convey them to said companies respectively. So that if those lands were part of the most valuable mineral lands of the McKean and Elk Company, as averred in the bill, the stock of the mining companies held by the McKean and Elk Company must still possess value." * * *

As to the public sales of land : " There are upwards of thirty persons interested as purchasers under the sale of October 1868, and those which followed it upon the same terms, who had paid for and taken conveyances of the land so purchased, according to the terms of sale, but who have not been made parties to the bill." * * *

" The opening of the Philadelphia railroad, whilst it had enhanced the value of the lands, had not caused them to be immediately saleable. The only sale made for cash after its opening was to Jackson Shultz in August 1867, for about 9000 acres, at $6 per acre, the minerals underlying being reserved; he established a large tannery, but would not have bought if the railroad had not been opened; it appeared that the other lands could not be sold in a reasonable time for prices satisfactory to the stockholders. On the 10th of February 1868, the directors submitted to them a report, advocating a conversion of the stock and bonds into the land itself by such stockholders as might desire to do so; this was unanimously adopted. The land was immediately divided into suitable parcels, having regard to their character and value; and maps, &c., prepared, showing the location of each parcel and its position relatively to mineral, timber and other advantages; this preparation showed great labor and care. At a special meeting of the stockholders May 12th 1868, the plan was recommended by a committee of the directors, who made an elaborate report on the subject. The report was ordered to be printed and a copy sent to each stockholder; the meeting adjourned for two weeks. The report con-

tained a valuation of the land which after deducting an amount sufficient to pay the bonds, other liabilities and leaving a cash balance, showed that " the value of each share of stock or its purchasing power" would be $20.44. The purchase-money was to be payable in cash, or in the mortgage bonds of the company, and stock in the following proportions: 80 per cent. in stock, 7 per cent. in first mortgage bonds or cash, 8 per cent. in second mortgage bonds or cash, and 5 per cent. in cash; any of the payments could be made in cash. At an adjourned meeting of the stockholders, May 29th 1868, the plan was approved and they resolved that the directors be authorized to sell the lands to the stockholders, or any other persons who would buy on the conditions of the plan before the next July 15th; that the bondholders be requested to agree to release the lien of the mortgages on any lands sold on the terms mentioned in the resolution; that if the bondholders would not agree to release or the whole of the lands should not be taken, the directors were authorized to sell the lands at public sale in Philadelphia on the third Tuesday of the next October, after notice by publications specified in the resolution, and in such manner in addition as should be calculated to give full information. All the shareholders did not agree to the plan and the sale was held at the Philadelphia exchange on the 20th of October 1868. The terms were cash, or 36 per cent. of the purchase might remain secured on the premises sold, payable in five annual instalments; 62 per cent. in the company's stock at $6 per share, and 2 per cent. cash to be paid when the land was struck off; any of the payments might be made in cash. Purchases were made by stockholders only and amounted to 28,000 acres for $342,617, of which 2 per cent. was paid in cash and the remainder in the mortgage bonds of the company. On the 22d of October the directors authorized the president and treasurer to sell the remainder of the land, at the minimum price and on the terms proposed; 18,000 acres were sold to the stockholders, the prices aggregating about $160,208.

" By this plan, while the purchasing power of the stock was reduced from $20.44 to $6 per share, the minimum prices of the lands offered for sale were reduced in corresponding proportion. It was believed that, by reducing the minimum prices to correspond as near as practicable with the prices at which similar lands near to or adjoining those of the McKean and Elk Company had then recently been sold at private sales, persons who were not stockholders might be induced to purchase at this public sale. Tracts of land were sold at various prices, the average of which was about $11.25 per acre. Purchasers paid the 2 per cent. in cash, surrendered their mortgage bonds and stock, and received conveyances from the company, discharged from the lien of the mortgages, and the mortgage debts and outstanding shares of stock were correspondingly reduced, before the bill in this case was filed.

[Watts's Appeal.]

* * * If it were conceded that the terms of sale were thus un-equal—and to that extent unfair—would the concession justify either decree for which the plaintiffs have prayed in that behalf? It might have furnished a ground for setting the sales aside, or an injunction against the consummation of them, remedies which must be sought before the price was paid and deed of conveyance delivered; but it is difficult to see that the sales were for that reason void, and could be so decreed upon complaint made eighteen months afterwards. The bill was not filed until April 1870.

" As to a decree that the directors do individually pay to the plaintiffs their due proportion of the value of the lands sold, and that they pay the taxes assessed and due upon the land, that would really be but a decree for individual damages, which are not recoverable in equity. The directors appear to have acted in this affair, as in others already noticed, at the instance of and in conjunction with the stockholders, and within the chartered powers of the corporation. The master is unable, therefore, to recognise that the directors have incurred individual liability in respect of the sales complained of. * * *

" The master has been unable to find any proof that either of the plaintiffs offered or even desired to purchase any of the land at the October sales. Afterwards, in May 1869, Charles E. Anspach, signing for himself and others, agreed to take five of the remaining sections, on the terms of the sales in October, but he did not comply with his agreement. It would appear from all the evidence taken together, that whatever may be the intrinsic value of the lands, they brought a fair market value; and if any particular tract or tracts were sold at a sacrifice, the fact has not been established by proof. If the prices at which other lands in the same neighborhood were sold, or the price of that sold by the company to Jackson Shultz, or the market value of the stock of the company at that time—each share representing one acre at least—is taken as a criterion of value of the land sold in October, it will be found in either case that the prices then obtained may well be regarded as fair market prices." * * *

The master then went into a calculation to show that the results of the sales did not produce injury to the plaintiffs.

" There is still the objection contained in sect. 32 of the bill, that the directors became purchasers at the public sale in October 1868, ' upon such terms and conditions as they themselves had prescribed.' The master is of the opinion, in view of the facts already stated, that the terms and conditions of the sale, and the sale itself, should rather be regarded as having been prescribed by the stockholders, and that the duties of the directors in relation to it were ministerial only."

As to the buildings: " It is claimed in the answer, that the buildings complained of were erected for the purpose of stimulating

[Watts's Appeal.]

sales of the lands, and that the work was done with the full knowledge and approval of the stockholders, in annual and special meetings assembled; that the hotel and buildings were erected at the town of Kane, under a promise of the Pennsylvania Railroad Company (lessees of the Philadelphia and Erie) to make that a stopping-place for their trains, and the site of their machine and work-shops, if they were finished in accordance with a certain plan; before that was done, there were no accommodations for persons visiting the lands; that they were authorized to be built in 1865, but not finished until 1868, being several times stopped for want of funds; and the stockholders were from time to time notified of the progress of the hotel, and appealed to for contributions of funds to complete it; that during the presidency of Mr. Watts, the company became possessed of a saw-mill. A new one was erected with a view to furnishing the timber for the hotel and buildings, and to showing the company's resources in timber, and thereby encouraging sales. * * * The real question, therefore, relates to the power of the McKean and Elk Company to erect the buildings.

" The averments of the answer appear to be supported by the evidence in relation to the buildings, and the motives for erecting them. The contest has been chiefly carried on concerning the hotel, which appears to have cost about $60,000. The cost of the other buildings does not appear in the evidence; and it is inferred, from what little has been said of the dwelling-houses, that they were erected in part for the use of employees of the company, and at no great expense.

" If it is true that the company was authorized by its charter to erect a hotel upon its land, then the master would not report that it was injudicious to erect the one in question; for if it has drawn to the same immediate locality a railroad station, depot, work-shops, and a machine-shop, and formed the nucleus of the growing town of Kane—on the line of the Philadelphia and Erie Railroad—it can hardly be called an injudicious improvement to stimulate sales of the lands. And it has not been shown that stockholders have been injured by it, for the company still owns the hotel, and the evidence furnishes no reason to conclude that it is not worth all it cost.

" The directors acted in this matter under a belief that they were authorized by the charter, and still more directly by the supplement of March 16th 1867, to improve the property of the company in the manner they did. Such also appears to have been the opinion of the principal plaintiff in this case; for it is in proof that Mr. Watts, speaking of the said supplement to the charter, said to one or more of the directors: ' This, gentlemen, is just what you want. You can do anything under this you please.' Neither of the other plaintiffs was a stockholder when the work was undertaken. * * *

28 P. F. Smith—25

The master is of the opinion that the hotel was not such an improvement as the company was authorized to make. It has appeared to him, that both Mr. Watts and the directors were mistaken—but fairly and honestly mistaken—in their construction of the power conferred by the supplement which authorized the borrowing of money 'for the purpose of improving and developing the lands of the said company, and for all other purposes of said corporation;' and that the phrase, 'for all other purposes of said corporation,' is referable to such purposes as were justifiable under the charter as it stood before the supplement was passed. * * *

" The master has been unable to find evidence of objection on the part of any stockholder other than Mr. Watts, prior to the institution of this suit, to either of the matters complained of in the bill. It is considered by the master that neither of the plaintiffs, except Mr. Watts, has shown that he has a status to contest the subscription to the Sunbury and Erie Railroad, nor the first issue of bonds and the mortgage made to secure them ; nor the erection of the hotel. They did not become stockholders until after the subscription had been made and settled for, and the bonds had been issued, and the hotel had been authorized and was in course of erection. The same may be said in regard to the sales of land to the Erie and to the New York and Erie Mining Companies, which appear to have been authorized at a directors' meeting held on the 11th day of May, and the terms of sale concluded on the 5th day of November 1865. Hence, the master considers that Mr. Watts is the only one of the plaintiffs who has shown a status to inquire into or contest either of those transactions. It may be important, then, as bearing upon the questions of laches and limitations—urged for the defendants—to know what was Mr. Watts's course of dealing with the several matters complained of prior to the commencement of this suit. The following facts are deduced from the evidence, as bearing upon this branch of the case."

The master then recapitulates the facts of Mr. Watts's dissatisfaction with the railroad subscription, with the mode proposed to raise money to pay, occurring ten years before filing the bill ; that first mortgage bonds were issued seven years before filing the bill, Mr. Watts then asserting that the measure was not within the corporate powers of the company ; that he knew that the other stockholders and directors differed from him and that they were managing the corporation in accordance with their own views ; and that he knew of various other matters of which he complains in the bill, at times considerably anterior to filing the bill; that whilst protesting against many of those things of which he complained, he took no other steps to arrest them ; that he saw and had knowledge of the improvements being made, and of many of the expenditures complained of, without making objections within a

[Watts's Appeal.]

reasonable time, in some cases not until the institution of these proceedings.

" The master is of opinion that it was the duty of Mr. Watts— if he meant to contest the subscription to the Sunbury and Erie Railroad, or either of the issues of bonds, or the mortgage made to secure them, or either of the sales of lands, or the erection of the hotel or of the saw-mill—to make his application to a court of equity without unnecessary delay. And further, that the delay which preceded the commencement of this suit—regarded in connection with the large sums of money invested by directors and stockholders of the company, as well as by third persons in the intervening time, and upon the faith that the proceedings of the company were legal—has been sufficient to warrant a denial of relief to the plaintiffs in a court of equity. The plaintiffs' duty to proceed at an earlier day was, in the view of the master, no less to the directors and other stockholders of the company—who contemplated investing their own money in large sums, incurring heavy expenses, and assuming new relations to the property, in the belief that they were acting by due authority and for the general good— than to third persons who were to enter into contracts and invest their money also, upon the faith of the legality of the company's acts. The various periods of delay between ten years as the longest, and eighteen months as the shortest, were surely long enough, under the circumstances of this case, to raise a counter equity against the plaintiffs. And it will be remembered that the rule, that a party guilty of unreasonable delay in the enforcement of his rights, thereby forfeits his claim to equitable relief, is more especially applicable to cases in which he lies by until other parties have incurred expenses, invested money, or entered into relations or engagements of a responsible or burdensome character."

The master reported that in his opinion the plaintiffs' bill should be dismissed ; he reported also the form of a decree in accordance with his opinion.

The plaintiffs filed exceptions to the report.

The court at Nisi Prius (Williams, J.) overruled the exceptions, and decreed that the bill be dismissed.

The plaintiffs appealed to the court in banc, and in a number of specifications assigned the decree for error.

*S. G. Thompson* and *H. M. Watts, p. p.*, for appellants.—The subscription to the stock of the railroad company was not within the powers conferred by the charter, and to such powers the corporation was restrained: Coleman *v.* Eastern Co., 10 Beav. 15 ; Solomons *v.* Laing, 12 Id. 252 ; Taylor *v.* Chichester & M. Railroad Co., Law Rep. 2 Exch. 370. The charter does not authorize the corporation to execute a mortgage, it therefore could not do so : Commonwealth *v.* Erie & N. E. Railroad Co., 3 Casey 339. The

act under which the second mortgage was made authorized the borrowing money to *improve* and *develop* the lands; the mortgage was authorized by the stockholders to discharge the present indebtedness, and provide for future obligations; it was therefore *ultra vires.* The lands were conveyed to the corporation under the condition in the charter that there should be an annual dividend; when that failed the landowner had the right to have his stock cancelled, and the land reconveyed to him: Pitts. & C. Railroad Co. *v.* Stewart, 5 Wright 55; Turnpike Co. *v.* Wallace, 8 Watts · 316. Neither was there power to sell the lands to the mining companies, and take in payment their stock, and thus deprive themselves of the means of carrying out the objects of their charter: Bedford Railroad Co. *v.* Bowser, 12 Wright 30. The plan for the public sale of the lands gave a preference to shareholders who were creditors of the company, and was in violation of the rights of the others: Reese *v.* Bank, 7 Casey 79. The directors were liable individually for injurious acts or omissions which they did not labor fairly to avert: Kane *v.* People, 8 Wend. 203; Robinson *v.* Smith, 2 Paige Ch. 222; Holton *v.* Iron Co., 2 Black (S. C.) 715; Percy *v.* Milander, 3 Louisiana 568. If the act is clearly *ultra vires*, the director is liable, though acting honestly: Spering's Appeal, 21 P. F. Smith 11.

*H. G.. Clay, J. G. Johnson, G. W. Biddle* and *J. A. Clay*, for appellees.—Directors are liable only where they have been guilty of some fraud on the corporation or connived at it in others: Spering's Appeal, 21 P. F. Smith 11; Hodges *v.* N. E. Screw Co., 1 R. I. 312; Calhoun's Estate, 6 Watts 185; Neff's Appeal, 7 P. F. Smith 91; Konigmacher's Appeal, 1 Penna. R. 215; Eyster's Appeal, 4 Harris 372; Dundas's Appeal, 14 P. F. Smith 325; Knight *v.* Lord Plymouth, 3 Atkyns 480. The plaintiffs have been guilty of such laches as prevent them from obtaining relief:. Graham *v.* Birkenhead Railway Co., 2 Macn. & G. 146; Ffooks *v.* Railway Co., 19 Law & Eq. 7; Cooper *v.* Hubbook, 30 Beav. 162. Protests alone are not sufficient: Clegg *v.* Edmondson, 8 DeG., Macn. & G. 787; Gr. West. Railway Co. *v.* Oxford, 3 Id. 318; Peabody *v.* Flint, 6 Allen 57; Fuller *v.* Melrose, 1 Id. 166; Hilton *v.* Granville, 1 Craig & Phil. 292; Leaming *v.* Wise, 23 P. F. Smith 173; Negley *v.* Lindsay, 17 Id. 226; Ashhurst's Appeal, 10 Id. 290. The primary duty of the company was to sell their lands; unless such road as the Sunbury & Erie Railroad were built this could not be accomplished; the power to subscribe for the stock was necessarily incidental. The Act of 1852 gave this power; being an enabling public act, it was not necessary that the stockholders should accept it, and it was a general law when this company was incorporated: Brown *v.* Commissioners, 9 Harris 37; Commonwealth *v.* Slifer, 3 P. F. Smith 71: Commonwealth

[Watts's Appeal.]

*v.* Montrose, 2 Id. 391.   The company having authority to contract debts, the bonds are good, though the mortgages were unauthorized : McMasters *v.* Reed, 1 Grant 47 ; Commonwealth *v.* Perkins, 7 Wright 402.   A purchaser of a bond has the right to presume that every prerequisite to give it force has been complied with: Commonwealth *v.* Pittsburg, 10 Casey 520.   A power in a corporation to purchase real estate implies a power to sell and mortgage : Jackson *v.* Brown, 5 Wend. 590 ; Angell & Ames on Corp. 200 ; Barry *v.* Merchants' Exch. Co., 1 Sandf. Ch. 280 ; Brady *v.* Meyer, 1 Barb. 584 ; Curtis *v.* Leavit, 15 N. Y. 9 ; Leavit *v.* Blatchford, 17 Id. 521 ; Barnes *v.* Ontario, 19 Id. 152 ; Fay *v.* Noble, 12 Cush. 1 ; Davis *v.* Meeting House, 8 Metc. 321 ; White Water Canal Co. *v.* Valette, 21 Howard 414 ; Strauss *v.* Eagle Ins. Co., 5 Ohio 59.   A power to borrow implies a power to mortgage: Susquehanna Bridge Co. *v.* Ins. Co., 3 Md. 305 ; Richards *v.* Merrimac Co., 44 N. H. 127 ; s. p. 4 Metc. (Ky.) 199 ; Leggitt *v.* N. J. Bank. Co., 1 Saxton 541 ; Gordon *v.* Preston, 1 Watts 385 : Zane *v.* Kennedy, 23 P. F. Smith 182. A director or officer of a corporation who is its creditor, may purchase its property : Murray *v.* Vanderbilt, 39 Barb. 157 ; Mickles *v.* Rochester Bank, 11 Paige 119 ; Worcester Turnpike Co. *v.* Willard, 5 Mass. 80 ; Middlesex Turnpike *v.* Swan, 10 Id. 384 ; Ashhurst's Appeal, 10 P. F. Smith 290.

Mr. Justice GORDON delivered the opinion of the court, October 12th 1874.

In the absence of a demurrer, we treat as waived those objections to the bill which are urged on the ground of multifariousness, both as to the parties and the relief prayed for.

Exceptions of this kind are but technical, and if brought to the notice of the court in a formal manner, and at a proper time, opportunity is furnished to the plaintiff to meet them by amendment. If, however, the defendant does not see proper thus to bring them to the notice of the court, it will be presumed that he elects to proceed with the case on its merits.

Besides this, the court generally has power, by its decree, to meet and obviate any difficulties that may arise from causes of this kind. We therefore proceed, at once, to the investigation of the charges made against the directors of the McKean and Elk Land and Improvement Company, who are the real defendants in this case.

The plaintiffs, shareholders of the stock of this company, charge the directors with a mismanagement of the affairs of this corporation, so obvious and gross, and so wilfully perversive of the charter thereof, as to amount to a fraud upon their rights and interests. It is for cause of this kind that our intervention as a court of equity is demanded.

That a bill may be maintained against directors personally, under

circumstances such as above alleged, is well established by many authorities. Among the most recent we cite the case of Spering's Appeal, 21 P. F. Smith 24.

Not only may the shareholder thus call the directors to a formal account where he has been fraudulently deprived of money justly belonging to him, but he may also, under proper circumstances, interpose for the protection of the company itself: Gravenstine's Appeal, 13 Wright 310, Thompson, J.

Having thus disposed of the technicalities encumbering the case, we proceed to examine the specific charges brought by the plaintiffs against the defendants, and upon the truth or falsehood of which this case must be determined.

The directors, defendants, are charged with the commission of the following acts, either wholly without warrant or in excess of the powers vested in them by the charter of incorporation, viz. :—

1. Subscribing for sixteen hundred and twenty-five shares of the Sunbury and Erie Railroad Company's stock, to be paid for by one hundred thousand dollars in cash, and five thousand acres of land.

2. Executing two mortgages upon the land of the company. One dated February 1st 1863, and the other June 22d 1867; the first to secure the payment of bonds, therein recited, to the amount of two hundred thousand dollars, and the second to secure the payment of like bonds to the amount of two hundred and sixty-seven thousand dollars.

3. Executing, in the year 1865, deeds for a large body of the company's land, to the New York and Erie and the Erie Mining Companies, and taking in exchange therefor 11,750 shares of their stock.

4. Selling 35,600 acres of the company's land to the stockholders, including themselves, to be paid for in the manner following, viz., sixty-two per cent. in the stock of the corporation, thirty-six per cent. in the bonds thereof, and but two per cent. in cash.

5. Erecting saw-mills, a hotel and other buildings upon the corporate property.

In this brief of the plaintiffs' specifications of the misdeeds of the defendants, we have not included one or two of minor import, which we may now notice and dispose of.

It is alleged that Mr. Watts has persistently since November 1859, endeavored to purchase from the directors so much of the lands of said company as he might justly be entitled to, offering to pay for the same in shares of its stock, and that they have as persistently refused to accede to his offers.

It is further alleged that they refused a bid of twenty-five dollars per acre from one Mr. Putman for four thousand acres of said lands.

In the first of these alleged cases, we are not sufficiently informed,

from the evidence, to determine whether the directors did well or ill in rejecting these offers.

In the second case, the evidence leaves it very doubtful whether any such offer was made with the bonâ fide intent to purchase.

Admit, however, that this offer was made in good faith, and that in both cases the propositions were imprudently rejected; yet, as they were matters resting wholly in the judgment and discretion of the directors, they are beyond our power of review. Their conduct in the premises may have been unwise, but it was not legally reprehensible.

Without regard to the order of the charges as contained in the bill, we proceed to discuss the items thereof as they present themselves to our mind in apparent legal sequence. First, then, had the directors power to contract debts for the company, and to execute bonds and mortgages to secure the payment thereof? In the case of the Commonwealth *ex rel.* Reinboth *v.* The Councils of Pittsburg, 5 Wright 284, Justice Strong says: "The power to execute and issue bonds, contracts or other certificates of indebtedness, belongs to all corporations, public as well as private, and is inseparable from their existence." If this be good law, and we think it is, the question as to the power of the directors of the McKean and Elk Land and Improvement Company, to contract debts and issue the bonds of the corporation therefor, would seem to be settled. The very power to contract necessarily involves the cognate power to create debt; and a corporation, without such power would be a body without life, utterly effete and worthless. If, however, it be objected, that one may have the power to contract debts binding upon his principal, and yet not have the power to bind him by deed, it is answered, these directors have such power under the charter. They have the power to dispose of the whole of the company's lands, by deed or lease, and as they possess this superior power, the minor one of the mortgaging those lands upon a proper occasion, and for a proper debt, may be inferred: Lancaster *v.* Dolan, 1 Rawle 231: Gordon *v.* Preston, 1 Watts 385.

The inquiry, then, is not as to the general authority of these men to contract debts on the credit of the company, and to provide for their payment by issuing of bonds secured by mortgage, but it is rather, had they the power to contract the specific debts complained of? If not, was the contracting thereof so clearly beyond their powers that we must impute to them the commission of a wilful wrong or a carelessness, so obvious to ordinary discretion that it amounts to the same thing?

There is nothing in the evidence which tends to show that what these directors did in the premises was intended to benefit themselves beyond or above their fellow-shareholders, or to implicate them in any actual fraud. Under such a state of facts, we will not consent to charge them with the results of such ordinary errors of

judgment as men of common prudence might fall into, in the conduct of their own business.

The status of directors, and the amount of judgment, care and skill required of them, is so clearly set forth in the opinion of our brother Sharswood, in Spering's Appeal, 21 P. F. Smith 11, that we are relieved from the necessity of further investigation or elaboration of these points.

From this case we learn that directors are mandatories only, and as such, held to but ordinary skill and diligence, and are not responsible to their fellow corporators for the want of judgment and knowledge. They are personally liable only where they are guilty of fraudulent conduct or of acts clearly *ultra vires*.

With this light upon the subject it is not difficult for us to determine that the charge of the misappropriation by the directors of the funds of the company, by the erection of saw-mills, a hotel and other buildings, cannot be sustained. For it will be observed our inquiry is limited to the question of the power to make such improvements. If they had such power, we, as already intimated, will not sit to determine whether or not they erred in judgment in respect to the character or cost thereof.

Now this corporation had, *inter alia*, these very general and necessary powers, to wit : " To aid in the development of the minerals and other materials " in and upon the lands, and " to promote the clearing and settlement of the country."

We know of no other material upon these lands, more abundant or more obviously requiring development, than the timber, which covered them in an almost unbroken forest. Neither can we conceive of anything better calculated to develop this kind of material than saw-mills. So we regard a hotel, of some kind, in so large a territory of wild lands as not only a convenience, adding greatly to the settlement of the country, but a necessity.

Conceding, however, that we have misread the charter, and that the defendants exceeded their power in the erection of the buildings, yet as none of the plaintiffs, or others of the shareholders, objected during the time of their erection, nor until the filing of this bill, some two years after the completion of the last one—the hotel—it would indeed be a very strange kind of equity that would compel the directors to account for moneys expended in an enterprise in which the plaintiffs, by their silence, if nothing more, acquiesced. Furthermore, it is not alleged that the hotel, the building concerning which the greatest complaint is made, has not accomplished its purpose ; that the company did not derive all the advantages which were expected, or that the building is not worth all it cost. As therefore no loss has been wrought, no account can be taken.

With regard to the subscription to the stock of the Sunbury and Erie Railroad Company, we are inclined to think that this act,

though perhaps not wholly beyond the powers conferred by the charter, was at least in excess of that authority. The subscription amounted to one hundred and sixty-two thousand dollars; the stock was worth only about thirty-six dollars in the hundred, hence there was in effect a donation to the railroad company of about one hundred thousand dollars, but this amounted to as much as the entire capital stock authorized by the Act of Assembly to be raised for improvement purposes.

Notwithstanding this, the question remains, was this act so clearly in excess of their authority that the directors were bound to know and avoid it? Because, if while these men were acting honestly, and for what they esteemed the best interests of the company, they were not wilfully perverting their powers, but only misjudged the same, we cannot consent to compel them to account personally for the moneys thus expended. In order to arrive at a correct conclusion in this matter we must consider all the circumstances by which they were surrounded.

The powers already noticed, to aid in the clearing and settling of the country, as well as the further power to build not more than twenty miles of railroad, were conferred upon the company in order to make the main object of its organization, i. e., the sale of its lands, at remunerative prices, feasible.

This property lay in a section of the state remote from any large stream, and some forty or fifty miles from the nearest railroad. Even the common roads were few and almost impassable. Under such circumstances these lands were, so far as a present market value was concerned, not worth the taxes annually assessed on them; yet they contained within them valuable minerals and were clothed with forests of excellent timber. But these were useless without the means to transport them to market. When, therefore, the directors of the Sunbury and Erie Railroad proposed, upon a subscription to their stock of one hundred and sixty-two thousand dollars, to adopt a route for their road which would carry it through the heart of the McKean and Elk Land and Improvement Company's land, it is not surprising that not only the directors but also the stockholders thereof should have agreed to the proposition. That they had the power to build both common roads and railroads, or to aid others to a reasonable extent in so doing, is beyond doubt. Under such circumstances, their subscription, though larger than was warranted, looks to me more like a mistake in judgment than a wilful perversion of power. But passing this we come to another phase of this case, which we regard as definitive. This subscription, as before observed, was made for the honest purpose of benefiting the company; it was not made in haste, but was some four years in process of consummation. In the meantime it met the approval of the stockholders at their meeting May 16th 1862. There was, therefore, ample notice to all

[Watts's Appeal.]

concerned, and ample time for protest and the intervention of the preventive process of the law. Without any precedent authority we might well come to the following conclusions: first, that when an act done by directors is in excess of their authority, yet has been done with the bonâ fide intent of benefiting the corporation which they represent, and a shareholder knowing thereof does not dissent within a reasonable time, his assent to the act will be presumed, and he will be estopped from gainsaying it. For his silence, when he ought to speak, is such a neglect of duty towards those who are gratuitously serving his company, that he is entitled to no consideration in a court of justice.

Second. That when the act complained of is to be followed by a large expenditure of money, the shareholder should not only file his protest within a reasonable time, but should follow up the same by active preventive means. For it is obviously against good conscience, that one having the power to prevent it should stand by and see his associates expend money, that may result to his benefit, and afterwards charge them therewith. He may not thus pocket the gain resulting from his delay or thus wait in order to observe the result of the experiment, and when it fails to produce the result expected, fall back upon his protest as a saving of his legal remedies. His neglect to act at the proper time bars his right of action as effectually as his neglect to protest.

These doctrines are, however, abundantly supported by the authorities quoted by the learned counsel for the defendants; *inter alia* Great Western Railroad Co. *v.* Oxford, 3 DeGex, Macn. & G. 341; Clegg *v.* Edmondson, 8 Id. 787; Ashhurst's Appeal, 10 P. F. Smith 290.

So far as we are informed, none of the plaintiffs, except Mr. Watts, so much as interposed an objection to this action of the directors. They are therefore so clearly in default and so obviously estopped by their neglect, that we may dismiss their claims without further consideration.

Henry M. Watts, however, did interpose his dissent. He did so in his letter to the company dated November 19th 1859. Again, in his letter to John C. Cresson, president of the company, dated 24th day of February 1862, he reiterates the opinion that the subscription was *ultra vires*. It was not, however, until the 19th day of September 1866, that he so much as intimated the possibility of a suit for the purpose of testing the action of the board in making this subscription and executing the mortgage. Were these expressions of dissent sufficient to relieve him from the charge of neglecting the proper assertion of his rights until through his own laches he had forfeited them?

From 1859 to 1863, this matter was in abeyance, unconsummated. He was fully informed of every step in the programme. He knew that in 1862, the stockholders had ratified the action of

the directors, by authorizing the execution of the bonds and mortgage in order to raise the money with which to pay the subscription.   Yet, during all this time, he contented himself with a mere dissent.   A dissent, clear enough, indeed, as to the doubts and legal propositions therein raised, but nothing but a dissent.   Under the circumstances, we think he did not do all that was required of him.   Had he at the proper time invoked the restraining power of the courts, all things would have been properly adjusted, and all improper actions arrested.   Instead of this, he refrains from this obvious course of action, until the matter is fully consummated, and until he has derived every possible benefit therefrom. He permits the experiment to proceed to completion, before he attempts to call his fellow corporators to an account.   Under such circumstances, we could not have helped him had he commenced his proceedings immediately after the payment of the subscription to the railroad company.   But his case is entitled to still less consideration, because he allowed no less than seven years to pass between the consummation of the transaction and the issuing of his legal process.

Were we to hold these directors to the duties and responsibilities of trustees, yet six years would bar an action against them for misuse of the corporate property : Ashhurst's Appeal, *supra.*

The charge relating to the transfer of lands to the New York and Erie and Erie Mining Companies, and the taking of their stock therefor cannot be sustained.   Whilst we are inclined to think that this exchange of land for stock of companies other than their own was unwarranted, yet no harm has been done upon which the plaintiffs can found a bill.   If this act of the directors was *ultra vires*, it is very clear their deed conveyed no title.   All persons dealing with them for the lands of the company, were bound to take notice of the extent of their powers, and if the companies named chose to deal with them outside of those powers, they took nothing thereby.   It follows, that as the company lost nothing, the directors are liable for nothing.   If, however, the act was within their powers, they did what their judgment dictated as best to be done, and we cannot interfere to review a matter of discretion ; *a fortiori*, when the shareholders interposed no dissent at the time, nor until the bringing of this bill.

With reference to the sales made in 1868, a few words will suffice.   These sales were ordered by the stockholders themselves. Payment in the bonds of the company was equivalent to payment in cash, and payment in the stock of the company was expressly authorized by the act of incorporation.   That the directors should be permitted to purchase, was part of the arrangement and was beneficial to all parties.   They were therefore within the rule asserted by Justice Strong in Ashhurst's Appeal.

The whole affair was conducted openly and fairly ; the lands

brought good prices ; much better than could have been realized at cash sales, and we cannot see what good could be accomplished by setting them aside.

Thus, upon a careful review of all the points made in this case, and of the facts revealed by the master's report, and the paper books submitted to us by the parties, we have no hesitation in coming to the conclusion that the decree of the Court of Nisi Prius was correct.

Appeal dismissed at cost of appellant.